IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:22-CV-383-M

| | | |
|---|---|---|
| PABLO ESPIN, *on behalf of himself and others similarly situated, et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | ORDER |
| v. | ) ) | |
| CITIBANK, N.A., | ) ) | |
| Defendant. | ) | |

This matter comes before the court on Defendant Citibank, N.A.'s ("Citibank") renewed motion to compel arbitration and to stay action, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* [DE-84]. Plaintiffs Pablo Espin, Nicholas Padao, Jeremy Bell, and Keith Taylor, on behalf of themselves and others similarly situated, (collectively, "Plaintiffs") oppose the motion, [DE-88], and filed a notice of supplemental authority, [DE-89], and Citibank filed a reply, [DE-90]. The motion is ripe and has been referred to the undersigned for disposition. *See* Feb. 6, 2026 Am. Text Order; 28 U.S.C. § 636(b)(1)(A). For the reasons stated below, the motion to compel arbitration and to stay action is allowed.

## I.    Background

Plaintiffs, current or former members of our nation's military and Citibank account holders, brought this putative class action generally alleging that Citibank's benefits provided to servicemembers are "often illusory" and "[r]ather than permanently forgiving the interest and fees, Citibank retroactively takes back this benefit by imposing an interest rate penalty on servicemembers after they leave active duty and return to civilian life" in violation of the

Servicemembers Civil Relief Act ("SCRA"), the Miliary Lending Act ("MLA"), the Truth in Lending Act ("TILA"), and the Credit CARD Act of 2009 ("CARD Act"), and in violation of state law giving rise to claims for breach of contract, breach of implied covenant of good faith and fair dealing, and breach of fiduciary duty or special trust. Plaintiffs also asserted equitable claims for accounting and constructive trust and, finally, a claim for declaratory judgment. *See generally* Compl. [DE-1].

In response to the complaint, Citibank filed a motion to dismiss, [DE-20], and a motion to compel arbitration, [DE-22], and Plaintiffs then filed an amended complaint, [DE-26], which Citibank again moved to dismiss, [DE-32]. The court ultimately denied both the motion to dismiss and the motion to compel arbitration. [DE-56, -58]; *Espin v. Citibank, N.A.*, No. 5:22-cv-383-BO,[1] 2023 WL 6449909 (E.D.N.C. Sept. 29, 2023). Citibank filed a notice of interlocutory appeal from the order denying the motion to compel arbitration, [DE-60], which automatically stayed the case pending appeal, [DE-61, -64]. The Fourth Circuit on appeal ruled that the arbitration agreements were enforceable as to the SCRA claims and remanded the case with instructions to "compel arbitration in accordance with the terms of the parties' arbitration agreements, not only with respect to plaintiffs' SCRA claims but also with respect to all other claims except those brought under the MLA." *Espin v. Citibank, N.A.*, 126 F.4th 1010, 1019 (4th Cir. 2025). The court explained that the MLA claims were excepted because the MLA "does indeed manifest a congressional intent to override arbitration," and the other claims were included because "the plaintiffs' only ground for avoiding arbitration of them was based on the SCRA." *Id.* (citing 10 U.S.C. § 987(f)(4)). However, because the district court did not reach the parties' arguments regarding the applicability of the MLA, the Fourth Circuit instructed the district court to make that

---

[1] This case was subsequently reassigned to Judge Myers (No. 5:22-cv-383-M, Aug. 27, 2025 Text Order).

determination on remand and to address any other issues on the MLA claims that the parties might raise. *Id.* at 1020. The court denied the petition for rehearing, and the mandate issued on March 5, 2025. [DE-72]. Thereafter, by agreement of the parties, Plaintiffs filed a second amended complaint,[2] [DE-82], and Citibank responded with the instant renewed motion to compel arbitration and to stay action, [DE-84].

## II. Discussion

The FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Newman v. First Montauk Fin. Corp.*, No. 7:08-CV-116-D, 2010 WL 2933281, at *4 (E.D.N.C. July 23, 2010). "By enacting the FAA, Congress created a 'presumption' in favor 'of arbitrability,'" and "a court must resolve any doubts in favor of arbitration and compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Newman*, 2010 WL 2933281, at *5 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986)). However, the presumption of arbitrability only applies where there is a validly formed and enforceable arbitration agreement, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010), and the court looks to state law contract principles to determine whether a valid and enforceable agreement exists, *Scales v. v. SSC Winston-Salem Operating, Co., LLC*, No. 1:17-CV-539, 2017 WL 4467278, at *2 (M.D.N.C. Oct. 5, 2017) (citation omitted). Thus, arbitration will be compelled under the FAA "if (1) the parties have entered into a valid agreement to arbitrate, and (2) the dispute in question falls within the scope of the arbitration agreement." *Agyenim-Boateng v. T-Mobile Ne. LLC*, No. 5:25-CV-183-BO, 2025 WL 3277336, at *3 (E.D.N.C. Oct. 10, 2025)

---

[2] In addition to the original claims listed above, the Second Amended Complaint added an additional MLA claim and a state law deceptive trade practices claim.

3

(internal quotation marks omitted) (citing *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 563 (4th Cir. 2015); *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013)).

Here, the governing agreements between the parties at the time the accounts were opened contain arbitration provisions that are broad in scope and include the types of claims asserted in this case. *See* Booth Decl., Ex. C [DE-23-5] at 16[3] (Espin's Citibank Card Agreement arbitration provision: "You or we may arbitrate any claim, dispute or controversy between you and us arising out of or related to your Account," and "all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law;"); *id.*, Ex. E [DE-23-7] at 14 (Padao's Citibank Card Agreement containing substantially similar provision); *id.*, Ex. G [DE-23-9] at 11 (Taylor's Citibank Card Agreement containing substantially similar provision); Grayot Decl., Ex. A [DE-23-14] at 9 (Bell's Citibank Card Agreement containing substantially similar provision).

Plaintiffs do not contest the validity of the agreements or that they cover the parties' dispute but, rather, they argue that the MLA applies to Plaintiffs' accounts and overrides the arbitration agreements as to all of Plaintiffs' claims, not just those brought under the MLA. Pls.' Opp'n [DE-88] at 9–25. Citibank contends that the MLA does not apply to Plaintiffs' credit card accounts because they were opened before such accounts were covered by the MLA. Def.'s Mem. [DE-85] at 13–27; Def.'s Reply [DE-90] at 6–14.

---

[3] The page numbers referenced are those found in the CM/ECF footer where, as here, they differ from the document's internal pagination.

## A. The MLA Does Not Apply to Plaintiffs' Accounts

The MLA was enacted in 2006 to protect active-duty service members from predatory lending practices. *See Wood v. Omni Fin. of Nevada, Inc.*, No. 1:22-CV-1148-LMB-IDD, 2023 WL 3766524, at *1 (E.D. Va. May 31, 2023) (citing Department of Defense, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf), *dismissed*, No. 23-1662, 2023 WL 9020964 (4th Cir. Nov. 21, 2023). The MLA mandates "disclosure obligations and imposes various lending requirements and restrictions on creditors who extend consumer credit to covered members of the armed forces, i.e., active duty service members and their dependents," and the Secretary of Defense is charged with "prescrib[ing] regulations to carry out" the MLA. *Id.* at *2 (citing 10 U.S.C. § 987; *Davidson v. United Auto Credit Corp.*, No. 1:20-cv-1263 (LMB/JFA), 2021 WL 2003547, at *2 (E.D. Va. May 19, 2021); and quoting 10 U.S.C. § 987(h)). The MLA also reflects Congress's intent to override arbitration agreements:

> Notwithstanding section 2 of title 9 [*i.e.*, the FAA], or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made. 10 U.S.C. § 987(f)(4).

*Espin*, 126 F.4th at 1019. Although the MLA's implementing regulations initially did not include open-ended credit accounts, such as credit cards, the definition of "consumer credit" was expanded in 2015 to do so. *See Steines v. Westgate Palace, L.L.C.*, No. 6:22-CV-629-RBD-DAB, 2022 WL 18031492, at *3 (M.D. Fla. Dec. 14, 2022) (citing *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50,582 (Aug. 31, 2007) & 80 Fed. Reg. 43,560 (July 22, 2015)). The effective date of that amendment as applied to credit cards was October 3, 2017, and it was not given retroactive effect. *See* 10 U.S.C. § 987(h); 32 C.F.R. §

5

232.13(c)(1) ("[U]ntil October 3, 2017, consumer credit does not mean credit extended in a credit card account"); 80 Fed. Reg. at 43,561; *see also Allen v. Experian Info. Sols. Inc.*, No. SA-24-CV-00157-XR, 2024 WL 2228164, at *4 (W.D. Tex. May 16, 2024) (citing 32 C.F.R. § 232.12 ("Consumer credit that is extended to a covered borrower and consummated any time between October 1, 2007 and October 3, 2016 is subject to the definitions, conditions, and requirements of this part as were established by the Department and effective October 1, 2007.")). The Department of Defense ("DoD") explained that the effective dates of the MLA amendments "avoid the potential injustice and operational difficulties that could arise if new requirements under the final rule were to apply to pre-existing transactions or accounts involving consumer credit to covered borrowers." 80 Fed. Reg. at 43,591.

Here, each named Plaintiff's credit card account was opened prior to October 3, 2017. Booth Decl. [DE-23-2] ¶¶ 4–6, 13–15, 20–22; Grayot Decl. [DE-23-13] ¶¶ 4–6. Under a straightforward reading of the above-cited implementing regulations, Plaintiffs' accounts did not involve an "extension of consumer credit" under the MLA because credit cards were not covered under the MLA at the time Plaintiffs first opened their accounts. Thus, the MLA's arbitration bar does not apply. *See Allen*, 2024 WL 2228164, at *4 (finding credit card accounts opened prior to 2017 were not covered by the MLA, the MLA's implementing regulations did not apply retroactively to those accounts, and, therefore, the MLA did not preclude enforcement of the arbitration agreement); *Garcia v. Discover Bank*, No. EP-19-CV-00176-FM, 2019 WL 13191640, at *3 (W.D. Tex. Oct. 4, 2019) (concluding MLA did not apply to a credit card opened in 1997 because "the MLA does not to apply to consumer credit extended prior to 2007").

Plaintiffs attempt to avoid this result by arguing that the MLA's application is determined at the time of a credit card transaction rather than when the account was opened. Under Plaintiffs'

6

reading, the MLA would apply to any credit card transactions made by active duty servicemembers on or after October 3, 2017. Plaintiffs cite the case of *Am. Exp. Co. v. Koerner*, 452 U.S. 233 (1981), for the proposition that an "extension of consumer credit" includes credit card transactions, not just the opening of accounts, and further reason that "in enacting the MLA, Congress imported the phrase 'extension of consumer credit' directly from TILA," so we can presume that Congress "[knew] and understood the Supreme Court's long-standing interpretation of 'extension of consumer credit'—and intended to invoke it—when it passed the MLA." Pls.' Opp'n [DE-88] at 10–13.

The *Koerner* case addressed the question of whether American Express extended an account holder "consumer credit" under TILA, which would impose certain obligations on American Express. 452 U.S. at 240. The court initially observed that an extension of consumer credit first requires an extension of "credit," and, using the definition of credit in TILA, found that a credit card company "extends credit to an individual or an organization when it opens or renews an account, as well as when the cardholder actually uses the credit card to make purchases." *Id.* at 241. The Court explained that "[w]hen the account is opened or renewed, the creditor has granted a right 'to incur debt and defer its payment'; when the card is used, the creditor has allowed the cardholder 'to defer payment of debt.'" *Id.* The court then considered whether there had been an extension of "consumer credit" and determined there had not because none of the credit transactions was primarily for consumer purposes. *Id.* at 242. In doing so, the court expressly declined to decide when an "extension of consumer credit" occurs, explaining as follows:

> The language of § 161(a) does not distinguish between the two types of transactions included in the definition of "credit" or indicate which of them must satisfy the definition of "consumer" in order for the section to be applicable. There are several possibilities. The relevant extension of credit may be only the creation or renewal of the account. Under this view, adopted by the District Court, 444 F. Supp., at 340, if an account is opened by a natural person, its overall purpose must be considered.

7

If the account is opened primarily for consumer purposes, § 161(a) applies, even if the cardholder uses the card for an occasional nonconsumer purchase. On the other hand, the language might be interpreted to call for a transaction-by-transaction approach. With such an approach, § 161 would apply if the transaction that is the subject of the dispute is a consumer credit transaction, regardless of the overall purpose of the account. A third alternative would be to combine the two approaches by holding § 161 applicable to all disputes that arise under an account that is characterized as a consumer credit account as well as to any dispute concerning an individual transaction that is an extension of consumer credit, even if the overall purpose of the account is primarily a business one.

We need not choose among these alternatives in order to decide this case, for we find that respondent is unable to succeed under any of them.

*Id.* at 242–43. Therefore, *Koerner's* statements about when consumer credit might be extended are dicta because the court's holding turned on the commercial nature of the account rather than when the relevant extension occurs.

Furthermore, *Koerner* involved a TILA claim, and while Plaintiffs correctly point out that there is some overlap between TILA and the MLA, the cases cited by Plaintiffs for general propositions related to TILA, including their supplemental authority, neither squarely address nor are particularly helpful to deciding the unique MLA issue presented here.[4] *See* Pls.' Opp'n [DE-88] at 11–14; Notice of Suppl. Authority [DE-89]. The MLA also did not apply to credit cards when passed, which undermines Plaintiffs' argument regarding Congress's intent when it enacted the MLA. The DoD only later expanded the definition of "consumer credit" to include credit cards

---

[4] *See, e.g.*, *Hess v. Citibank, (S. Dakota), N.A.*, 459 F.3d 837, 843–44 (8th Cir. 2006) (interpreting distinction between "persons," which include estates, and "natural persons" under TILA and Regulation Z for the purpose of determining whether there had been an extension of consumer credit); *Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388, 393–94 (4th Cir. 2000) (analogizing a floorplan repurchase agreement to other unilateral contractual arrangements, such as the issuance of a credit card); *Vickery v. Empower Fin., Inc.*, No. 25-CV-03675-JSC, 2025 WL 2841686, at *6 (N.D. Cal. Oct. 7, 2025) (finding cash advances extend "credit" within the meaning of the MLA); *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1158 (W.D. Wash. 2025) (finding cash advances constituted credit under the MLA, which incorporated TILA's definition of "consumer credit"); *Catanach v. Citi Cards/Bank*, No. CV 06-1115 LH/RHS, 2008 WL 11451608, at *5–7 (D.N.M. Mar. 18, 2008) (deciding issue left open by *Koerner* regarding when "consumer credit" is extended, and concluding "the relevant transaction under 15 U.S.C. § 1666i was the initial extension of credit when the account was opened, rather than [a] specific [transaction], because that act resulted in the creation of an open end consumer credit plan.").

in 2015, so it is the DoD's intent that is relevant here, which it explained in the proposed rule

regarding the MLA's applicability:

> [T]he Department believes that 10 U.S.C. 987 should not be interpreted so as to impose restrictions on an existing agreement between a creditor and a consumer involving a credit transaction primarily for personal, family, or household purposes that spring to life when the consumer becomes a covered borrower when he or she begins active duty service in the military. Interpreting 10 U.S.C. 987 as applying only to a covered borrower who holds that status when he or she agrees to obtain the consumer credit is fair to the creditor who, at the outset of the transaction, should be in a position to know the status of its counterparty to the agreement. Moreover, the Department's longstanding policy regarding this aspect of the scope of 10 U.S.C. 987 is consistent with the provision set forth in § 987(f)(3), which makes any credit contract that is prohibited under 10 U.S.C. 987 "void from the inception of such contract." Section § 987(f)(3) would operate unjustly if a consumer, upon obtaining the status of a covered borrower, could sue the creditor to void an existing credit contract on the grounds that the contract—which may have been entirely lawful when originally entered into with the consumer—violates one or more provisions of 10 U.S.C. 987. One practical consequence of the Department's longstanding policy is that a creditor is not required to constantly monitor the status of each consumer who has obtained credit or holds an account for credit to assess whether the consumer is a "covered borrower;" rather, the creditor may conduct that assessment, as the creditor may so elect, only at the outset of the transaction or when establishing the account for consumer credit.

79 Fed. Reg. at 58,616. The MLA's implementing regulations and the DoD commentary regarding

the change do not support Plaintiffs' transaction-by-transaction theory.

In arguing for a transactional approach, Plaintiffs also point to (1) the MLA regulations'

definition of covered borrow, which uses the disjunctive phrase "at the time the consumer becomes

obligated on a consumer credit transaction *or* establishes an account for consumer credit," and (2)

that the phrase "becomes obligated" in the context of credit cards is commonly understood to mean

when a purchase is made. Pls.' Opp'n [DE-88] at 14–15 (emphasis added) (citing 32 C.F.R. §

232.3(g)(1); *Sharp Elecs. Corp*, 216 F.3d at 393–94); *see also* 32 C.F.R. §§ 232.1(c)(2) (requiring

MAPR statement be provided "before or at the time the borrower becomes obligated on the

transaction or establishes an account for the consumer credit."); § 232.2(a)(1) ("Nothing in this

part applies to a credit transaction or account relating to a consumer who is not a covered borrower at the time he or she becomes obligated on a credit transaction or establishes an account for credit."); § 232.3(g)(4) ("covered borrower does not mean a consumer who (though a covered borrower at the time he or she became obligated on a consumer credit transaction or established an account for consumer credit) no longer is a covered member . . . ."). Citibank counters that this disjunctive phrasing was added when the MLA was expanded to account for the difference between closed-end (a one-time loan) and open-end (revolving) credit. Def.'s Reply [DE-90] at 7 (comparing 32 C.F.R. § 232.3(g), with 32 C.F.R. § 232.3(c) (2013)).

The regulations support Citibank's interpretation. When credit cards became covered by the MLA, the definition of "covered borrower" was amended from "a person with the following status at the time he or she becomes obligated on a consumer credit transaction," 32 C.F.R. § 232.3(c) (effective Oct. 1, 2007 to Sept. 30, 2015), to "a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit," 32 C.F.R. § 232.3(g) (effective Oct. 1, 2015). Thus, the "consumer credit transaction" language that predated coverage of credit cards by the MLA is logically ascribed to closed-ended one-time transactions that were covered by the MLA at its inception rather than to credit card transactions. Another example is found in 32 C.F.R. § 232.13, which sets forth compliance dates for creditors. Section 232.13(a) provides the compliance date for both "a consumer credit transaction or account for consumer credit," but the exception specifically for credit cards found in subsection (c), refers only to a "credit card account." This supports the view that "obligated on a credit transaction" refers to the time when the borrower enters into a one-time closed-end extension of credit rather than referring to each swipe of a credit card.

10

The MLA's safe harbor regulation further supports Citibank's position. The regulations established a safe harbor for creditors to make a "one-time determination" as to whether an account involved a borrower covered by the MLA, and it was deemed "conclusive" so long as the creditor complied with the method set forth. 32 C.F.R. § 232.5(b)(3). In response to concerns creditors raised regarding the number of checks needed, the DoD explained: "[a]s the Department stated when issuing the Proposed Rule, the safe-harbor provisions of § 232.5(b) were designed to allow a creditor to be 'free from liability under the MLA at the outset of establishing an account for credit—and throughout the lifespan of that particular account—relating to that consumer.'" 80 Fed. Reg. at 43,578. The DoD also noted that "[m]any commenters observe that a creditor who, for example, issues a credit card could conduct a covered-borrower check at the time that the consumer applies for the card, but that under the Proposed Rule a creditor would need to conduct another covered-borrower check at or around the time that the consumer becomes obligated on the credit (by using the card), which typically occurs later." 80 Fed. Reg. at 43,586. The DoD explained that it "designed § 232.5(b)(3) in order to enable a creditor to conduct only one covered-borrower check within the permitted safe harbor at an early stage of the transaction or the relationship with the consumer, including at the time that the creditor develops a firm offer of credit to be provided to the consumer." *Id.* at 43,586. The DoD's safe harbor framework cannot be reconciled with Plaintiffs' transaction-by-transaction approach, whereby the MLA's application would have to be determined at every swipe of the card, effectively eliminating the safe harbor.

Plaintiffs also argue that when Citibank amended its cardholder agreements after October 2017, it triggered the MLA's application. Pls.' Opp'n [DE-88] at 22. As explained above, the applicability of the MLA is determined at the time of the account's opening, and there is no support

11

in the MLA or its regulations for finding that the MLA later becomes applicable based on subsequent changes to account terms.

Finally, Plaintiffs argue that the MLA prohibits enforcing the arbitration agreements against Plaintiffs Espin and Bell because they were serving on active duty when the case was filed and because Bell remains on active duty. Pls.' Opp'n [DE-88] at 21–22. Plaintiffs rely on the MLA's provision that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made," 10 U.S.C. § 987(f)(4), and argue that its disjunctive nature means that it applies to current active duty members regardless of when the arbitration agreement came about. Yet, this provision can only apply where the MLA itself applied in the first instance at the time the account was opened. In *Steines v. Westgate Palace, L.L.C.*, the Eleventh Circuit, interpreting § 987(f)(4), determined that "*[i]f the MLA applies* to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute." 113 F.4th 1335, 1344 (11th Cir. 2024) (emphasis added); *see Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1053 (N.D. Cal. 2025) (concluding that "*when the MLA applies*, the entire arbitration agreement is unenforceable and the parties cannot be compelled to arbitrate any covered dispute.") (emphasis added) (citing § 987(f)(4)); *cf. Russell v. Dave Inc.*, No. 2:25-CV-04029-MRA-MBK, 2025 WL 3691977, at *5 (C.D. Cal. Dec. 12, 2025) (recognizing that where dispute involves the extension of "consumer credit" within the meaning of the MLA, an arbitration provision is unenforceable under 10 U.S.C. § 987(f)(4)); *Moss*, 799 F. Supp. 3d at 1158 ("The central issue is whether the MLA applies, which would preclude arbitration.") (citing 10 U.S.C. § 987(f)(4)). As explained

above, because Plaintiffs' accounts were opened prior to October 2017, the MLA and its arbitration bar do not apply regardless of any subsequent changes to Plaintiffs' duty status.

### III. Conclusion

For the reasons stated above, the motion to compel arbitration and to stay is allowed, arbitration is ordered in accordance with the terms of the parties' arbitration agreement on all claims, and the case is stayed pending arbitration.

So ordered, this 23rd day of March, 2026.

Robert B. Jones, Jr.
United States Magistrate Judge

13